## VIRGINIA–CAROLINA CHEMICAL CORP. v. INDUSTRIAL PRODUCTS CORP.

### No. 11342.

United States Court of Appeals
Sixth Circuit.
April 10, 1952.

Horace Frierson and M. E. Queener, Columbia, Tenn., Frierson & Queener, Columbia, Tenn., on brief, for appellant.

Judson Harwood, Nashville, Tenn., Judson Harwood, Nashville, Tenn., on brief, for appellee.

Before HICKS, Chief Judge, and SIMONS and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

This is a suit brought by the Virginia-Carolina Chemical Corporation against the Industrial Products Corporation, seeking damages claimed to have been suffered by the action of the defendant-appellant in releasing waters of its dam and causing them to flood the property of plaintiff-appellee, which is situated along a stream below defendant's premises. The case was tried before a jury, and at the conclusion of the proofs, the defendant moved for a directed verdict in its favor. The district court denied this motion, and, *sua sponte,* directed the jury to return a verdict in favor of plaintiff-appellee, upon which, judgment was entered, and from which, appeal was taken to this court.

The factual background of the case is as follows: Appellant owned and maintained a dam that confines a body of about 65 acres of water in Arrow Lake, located near Mt. Pleasant, Maury County, Tennessee. Appellee's industrial plant is situated adjacent to a small stream known as Sugar Creek, into which the water from the lake flows, and is about 2¾ or 3 miles down the course of the stream from the dam. Located at the plant is a warehouse in which was stored property that was damaged by the floodwaters, and which is the basis of appellee's claim for a money judgment. In February, 1948, there occurred, during a period of five successive days,

the greatest rainstorm recorded in Maury County in forty-eight years. There was rainfall from February 9 to 11; but from February 11, at 5:00 P.M., to February 12, at 5:00 P.M., there was a recorded rainfall of 2.45 inches; and on the *one day* from February 12, at 5:00 P.M., to February 13, at 5:00 P.M., there was a recorded rainfall of 5.90 inches. The nearest approach to this record was in 1902 when it rained a total of 5.20 inches in *two* days.

Arrow Lake is formed by the dam in question. It is a wide earthen dam which has concrete abutments. The water in the lake is controlled by a spillway that has three openings on each side of a central concrete pier. In each of these six openings are placed three spillway control boards, one above the other. Each board is 10 inches in height and 7 feet in length. Since the dam is earthen, it will wash out if the water in the lake gets as high as to run over the top.

Sometime during the early morning of February 12, because of the rainfall and the rise of water in the lake, two of the spillway control boards were taken out of the dam by appellant company; and about 7:00 A.M. on the same morning, four more of the boards were removed from the top tier, and the water level of the lake began to drop as the water was released from the dam. By 1:00 P.M., the level in the lake had dropped more than a foot. It should here be remarked, in order to avoid confusion, that it was not the removal of these six spillway boards and the water thereby released, but, rather, subsequent events that are complained of in this suit. In fact, it is admitted that the removal of these boards did not cause any of the damage. The rains, however, caused the level of the lake to begin to rise again about 2:00 P.M. on the afternoon of February 12. From 2:00 P.M., there was considerable rain, but the record is not clear as to the exact amount of rain, measured in inches, that fell during the remainder of the day until 5:00 P.M., or from then on until the morning of February 13. However, from 2:00 P.M., on the afternoon of February 12 until 6:00 A.M. on the 13th, the water level of the lake

rose slowly but steadily. Officials of appellant company had been notified at 3:00 A.M. on February 13 that the lake was dangerously high, and several of them started from their homes for the dam about 3:15 A.M. on the morning of the 13th. In coming to the dam, their way lay through several areas of deep flowing surface water resulting from the rainstorm, in various places from 100 to 1,000 feet wide, and of such depth that they feared the water would drown the motors of their automobiles. It appears that this vast amount of surface water came from a watershed of 5½ square miles in area which did not empty into Arrow Lake above the dam, but flowed into Sugar Creek, below the dam and above appellee's plant. The officials of appellant company, however, finally reached the dam about 4:15 A.M. on the morning of the 13th. It was then raining so hard that although they had flashlights, they could hardly see them. At that time, an employee of appellant had just finished opening a valve in an 18-inch pipe that carried water from the lake to a clear water pond of the company. This volume of water never reached Sugar Creek but was retained in the pond. At 4:40 A.M., appellant's employees began pulling out 5 additional spillway boards. The first board was removed at 4:45 A.M.; the first three boards were out by 5:00 A.M.; the other two came out more slowly, the last being removed at 6:00 A.M. During all of this time, the rain was pouring down so hard that they could hardly see as far as their feet with their flashlights.

We now come to the situation at appellee's plant. As has been said, it was about 2¾ or 3 miles, by way of the course of the stream, below appellant's dam. Appellee's plant consisted of several buildings. One unit, for manufacturing a certain type of "pellet" rock wool insulation, was nearest Sugar Creek. Three other buildings were farther away from the creek and built on ground level about a foot higher than the "pellet" building.

On the afternoon of February 12, the water had risen to a depth of 4 to 6 inches in the "pellet" insulation building on the lower level. This level was about a foot below the ground level on which the warehouse was located; and on the afternoon of February 12, three motors in the lower building were disconnected on account of the depth of water in that building. On the night of February 12, the water from Sugar Creek having risen above the ground level on which the lower building was located, started running through a coke pile on that level. About 9:00 P.M. or 10:00 P.M. on the night of February 12, appellee company had to close down the plant located farthest from the creek on the higher level, and which was connected with the warehouse, because water was running into the building and had gotten into the ash pit at the boiler unit, putting the fire out. Appellee suggests that water from the breaking of a dam on another pond owned by a mineral company, and emptying into Sugar Creek at a point below appellant's dam may have contributed to the rise of water on the night of the 12th, which caused the plant on the high ground—of which the warehouse was a part—to be completely closed due to the water getting into the ash pit of the boiler. The floodwater remained stationary at this higher level where the warehouse was located, from the night of the 12th until about an hour before daylight, or at 5:00 A.M. on February 13, when the water began to rise fast. It reached its greatest height in the warehouse—5 to 6 inches—between 5:00 and 6:00 A.M. on the 13th. Any damage suffered by appellee must, therefore, have occurred before that time. According to one of the witnesses, at 6:00 A.M. on the morning of the 13th, the water at appellee's plant seemed to be receding slightly, and an hour and a half later, it was still receding.

The damage claimed by appellee resulted from the floodwaters soaking and ruining rock wool, rolls of paper, corrugated boxes, bags serving as containers for rock wool, all of which were stored in the warehouse; and for the loss of coke which was carried away by the waters, as well as the expense of removing rubbish.

It is admitted that a great amount of impounded water was released by appellant from its dam on the morning of February

13; but this does not necessarily prove that appellant's action in removing the spillway boards caused or contributed to appellee's damage. Three of the five spillway boards had been removed by 5:00 A.M. But appellee's evidence is to the effect that the water began to rise at its plant nearly three miles down the creek at the same time. Furthermore, there is evidence that at the time the last spillway boards were removed, and the additional water released from the dam, the floodwaters were already receding at appellee's plant, and continued to do so. How long it took for the water from appellant's dam to reach appellee's plant, we do not know. There is no substantial evidence as to how long it took for water in the stream to get to appellee's premises, normally or in flood conditions, or what the nature of the water course was. What the evidence does disclose is that the downpour of rain between 5:00 A.M. and 6:00 A.M., on the morning on which appellee claims to have been damaged, was so heavy that a person could hardly see a flashlight at arm's length. It was the commencement of the greatest fall of rain in that part of the country in almost half a century; and from everything that appears, it rained harder between 4:00 A.M. and 6:00 A.M. that day than at any other period. During all of this time, a tremendous volume of water was streaming down in different places over a watershed of five square miles in area, flowing deep over the highways, carrying trash piles in its course, and pouring into Sugar Creek below appellant's dam and at a point on the stream above appellee's plant.

Whether the action of appellant company in removing the spillway boards, caused or contributed to appellee's damage depended on numerous factors, difficult to measure and weigh—time, distance, the different sources of the floodwaters, their volume, the intensity and incidence of rainfall at various times, the effect of the volume of water released from the dam through the conduit to appellant's fresh water pond, as well as that released through the spillways, and many other matters. The case seems peculiarly one for determination by the finder of facts—in this case, the jury. For in determining the issue—whether appellant company, in removing the spillway boards, caused or contributed to cause the damage complained of—we are clearly of the view that reasonable minds might well draw different conclusions from the evidence. The case should have been submitted to the jury.

In accordance with the foregoing, the judgment of the district court is reversed, and the case remanded for a new trial.